**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FRANCES BRADLEY-WAGNER, | ) | |
| | ) | CASE NO. 1:14CV2480 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff Frances Bradley-Wagner[1] ("Bradley-Wagner") challenges the final decision of

the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying

Bradley-Wagner's claim for a Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court

---

[1]In the administrative record, Plaintiff is referred to as "Frances Wagner Bradley."  *See, e.g.,* Tr. 11, 25, 27, 330.  In the instant case, however, the parties refer to Plaintiff as "Frances Bradley-Wagner."  The Court notes that Plaintiff signed her Application to Proceed *In Forma Pauperis* as "Frances Wagner."  (Doc. No. 2.)  As the Complaint and Briefs refer to Plaintiff as "Frances Bradley-Wagner," the Court will also refer to her as such herein.

pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

## I.  Procedural History

On May 27, 2011, Bradley-Wagner filed applications for POD, DIB, and SSI alleging a disability onset date of January 1, 2011 and claiming that she was disabled due to chronic back pain.  (Tr. 230-237, 286.)  Her applications were denied both initially and upon reconsideration.  (Tr. 131-136, 142-153.)  She timely requested an administrative hearing.  (Tr. 154-156.)

On May 8, 2013, an Administrative Law Judge ("ALJ") held a hearing during which Bradley-Wagner, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 25-73.)  On June 4, 2013, the ALJ found Bradley-Wagner was able to perform her past relevant work as a housekeeper/cleaner and, therefore, was not disabled.  (Tr. 11-19.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-5.)

## II.  Evidence

***Personal and Vocational Evidence***

Age fifty-four (54) at the time of her administrative hearing, Bradley-Wagner is a "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. §§ 404.1563 (d), 416.963(d).  (Tr. 45.)  She has past relevant work as a housekeeper/cleaner.  (Tr. 18, 62-63.)

Bradley-Wagner has either a sixth or eleventh grade education, depending upon conflicting evidence she provided in the record.  At the hearing, she testified that she left Addison Junior High School in the seventh grade because she was pregnant.  (Tr. 45-46.)  The

2

ALJ challenged this, stating that Bradley-Wagner had previously reported during her consultative examinations that she "dropped out of Margaret Allen High School after the eleventh grade." (Tr. 49, citing Tr. 330, 352, 357.) Bradley-Wagner responded that Margaret Ivan[2] is an elementary school on 55th and Chester in Cleveland, Ohio, and, therefore, she could not have attended eleventh grade there. (Tr. 49.) She explained that she may have misrepresented her education earlier due to embarrassment. (Tr. 48.)

Bradley-Wagner reported that she was identified as having learning disabilities and placed in special education classes. (Tr. 357.) She further reported that she struggled to understand and "keep up," and was often suspended for fighting, not listening, and hiding in lockers. (Tr. 357.) She never obtained a GED. (Tr. 357.)

**Medical Evidence**

There is no treating physician opinion in the record. However, Bradley-Wagner sought treatment for general medical problems, including hypertension and gastroesophageal reflux disease, as well as back pain and depression, with Mukul G. Pandit, M.D., an internist at St. Luke's Healthcare Center. Medical records from March of 2011 to January of 2013 are a part of the record. (Tr. 372-463.)

Bradley-Wagner complained of chronic lower back pain in March of 2011. (Tr. 373-375.) At the time, she was 5'7" and weighed 210 pounds. (Tr. 375.) Dr. Pandit recommended weight loss and educated her about the use of over-the-counter pain medication. (Tr. 376.) At an appointment on April 21, 2011, Dr. Pandit concluded that Bradley-Wagner's ongoing back

---

[2]The different names for the school are as they appear in the record.

pain was attributable to degenerative changes and noted that over-the-counter remedies were ineffective.  (Tr. 377.)  He prescribed Percocet, Flexeril, and Tramadol.  (Tr. 380.)

On May 11, 2011, Bradley-Wagner attended an appointment with Philip Stickney, M.D., an orthopaedic surgeon at St. Vincent Charity Medical Center.  She reported chronic severe back and leg pain that began in December of 2010.  (Tr. 370.)  She rated her pain as ten on a scale of one to ten (10/10).  (Tr. 370.)  She also reported an inability to walk more than ten to twelve minutes at a time.  (Tr. 371.)

On May 18, 2011, Bradley-Wagner underwent an MRI, which revealed: (1) at L3-L4, a left lateral disc protrusion compression of exiting left L3 nerve root, moderately severe degenerative facet arthropathy with ligamentum flavum, epidural lipomatosis, moderate central canal stenosis, and mild left foraminal stenosis; (2) at L4-L5, a broad based annular bulge, severe facet arthropathy, hypertrophy ligamentum flavum, epidural lipomatosis, moderate central canal stenosis, and mild bilateral stenosis; and, (3) at L5-S1, epidural lipomatosis with moderately severe central canal stenosis attenuating the thecal sac.  (Tr. 364.)

At an appointment on May 25, 2011, Dr. Stickney diagnosed lumbar spine stenosis at L-4 and bilateral leg radiculopathy.  (Tr. 369.)  He recommended three caudal blocks in order to relieve Bradley-Wagner's pain and recommended a follow-up appointment after the blocks were administered.  *Id.*

At an appointment with Dr. Pandit on August 4, 2011, Bradley-Wagner reported ongoing lower back pain with spasms and swelling.  (Tr. 381.)  She kept several appointments with Dr. Pandit through January of 2013.  He continued to prescribe Percocet to alleviate her back pain

4

during the entire treatment period.  (Tr. 389, 393, 395, 399, 401, 405, 419, 425, 429, 431, 435, 437, 445, 451.)

On December 22, 2011, Dr. Pandit's medical notes reflect that Bradley-Wagner reported she was suffering from depression after an episode of domestic violence.  Dr. Pandit noted she was prescribed Prozac "from [the] free mental health center."  (Tr. 401.)  She also reported a fall with no injuries.  (Tr. 399.)  At the appointment, Dr. Pandit further recommended a smoking cessation program.  (Tr. 401.)

On January 19, 2012, Bradley-Wagner reported feeling "jittery" on Prozac, but declined a prescription for a tranquilizer.  (Tr. 405.)  On February 16, 2012, Bradley-Wagner reported back and knee pain, as well as hip pain resulting from a fall.  (Tr. 407.)  For her depression, she was prescribed Paxil, but declined to take it because of side effects.  (Tr. 409.)

At an appointment on March 15, 2012, Bradley-Wagner reported pain resulting from an altercation with her boyfriend.  (Tr. 411.)  She was prescribed a third anti-depressant, Nortriptyline.  (Tr. 413.)  Due to nausea resulting from previous antidepressants, Dr. Pandit prescribed Celexa on April 26, 2012.  (Tr. 417.)

On June 13, 2012, more than one year after last seeing Dr. Stickney, Bradley-Wagner reported ongoing 10/10 pain; however, she conceded that she did not undergo the caudal block treatment recommended by Dr. Stickney due to a misunderstanding that surgery was involved. (Tr. 368.)  After a detailed explanation, Bradley-Wagner expressed interest in undergoing the caudal blocks.  *Id.*  At the time, Bradley-Wagner reported pain management prescriptions for Percocet and Flexeril.  *Id.*  Dr. Stickney diagnosed lumbar spine stenosis with neurogenic claudication and bilateral leg radiculopathy in S1 dermatomal distribution.  *Id.*

5

On June 21, 2012, Dr. Pandit noted that an x-ray showed mild disc space narrowing and recommended physical therapy.  (Tr. 425.)  Testing conducted by Dr. Pandit on July 19, 2012 revealed full motor strength in all of Bradley-Wagner's  muscle groups as well as normal coordination.  (Tr. 428.)  The only neurological deficit was impaired sensation in her left leg.  *Id.* At an appointment with Dr. Stickney on August 15, 2012, Bradley-Wagner reported continuing pain.  Plans for the caudal block treatment were made.  (Tr. 367.)

***State Agency Physicians – Physical Assessments***

At the request of the Social Security Administration, on September 19, 2011, Bradley-Wagner underwent a consultative examination performed by Dr. Eulogio Sioson, M.D., a physician specializing in internal medicine, pulmonary care, and geriatrics.  (Tr. 330-334.)  She reported neck, back, and joint pain; gastrointestinal problems; hypertension; and, a mental disorder.  (Tr. 330.)

Dr. Sioson performed a physical examination.  Findings established that Bradley-Wagner walked with a slight limp without an assistive device.  (Tr. 331.)  She was able to get on and off the examination table, but refused to attempt heel/toe walking or squatting, claiming back pain. *Id.*  Dr. Sioson found no obvious spine deformity, negative straight leg raise testing, normal reflexes, and no muscle atrophy.  *Id.*  Muscle testing was affected by her reports of pain.  *Id.* Plaintiff alleged pain on testing of grip strength stemming from an old finger injury.  She had slight swelling of her left knee, which was also slightly warmer than her right knee, but her joints otherwise had no heat, redness, swelling, subluxation, or gross deformity.  *Id.*  However, the examination and testing did reveal limited range of motion in both her cervical and dorsolumbar

6

spine, hips, knees, and shoulders. (Tr. 332-335.) Based upon his examination, Dr. Sioson opined that Ms. Wagner should be limited to "light or sedentary work."[3] (Tr. 331.)

State agency physician Elaine M. Lewis, M.D., reviewed the medical evidence and, on September 24, 2011, found Bradley-Wagner could perform light work with additional postural limitations. She concluded that the postural limitations were warranted based on the decreased range of motion in the shoulders, cervical spine, dorsolumbar spine, hip flexion, and knees. (Tr. 80-82.)

On May 8, 2012, following Bradley-Wagner's request for reconsideration of the initial decision denying benefits, a second consultative examination was performed by Michael A. Harris, M.D., a physical medicine and rehabilitation and pain management specialist. Bradley-Wagner reported intense 20/10 pain in her back that radiated to her legs and hands. (Tr. 350.) She further reported that Percocet, Tramadol, and Flexeril did not alleviate her pain, and that she

---

[3] 20 C.F.R. §404.1567(b) and 416.967(b), captioned "Light work," provide as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

20 C.F.R. §404.1567(a) and 416.967(a), captioned "Sedentary work," provide that: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

had not undergone steroid injections or physical therapy to address her back pain. *Id.* She had received steroid injections for her hands, which did not resolve her pain. (Tr. 351.) She reported frequently dropping items because of numbness in her hands. *Id.*

After performing the same physical examination and range of motion tests performed by Dr. Sioson, and reaching virtually identical results,[4] Dr. Harris found no evidence of spasm, trigger points, or scoliosis. (Tr. 352.) His examination revealed decreased range of motion in her cervical and dorsolumbar spine, hips, and knees, and decreased flexion in her right little finger. (Tr. 353.) His palpatory exam revealed diffuse tenderness in Bradley-Wagner's spine and bilateral paraspinal muscles. (Tr. 352.)

Dr. Harris concluded that Bradley-Wagner suffered from chronic spondylogenic back pain, secondary to minor degenerative changes as well as myofascial component, bilateral lower extremity radicular syndrome, bilateral Dequervain's tenosynovitis, and bilateral knee pain. (Tr. 353.) Based upon his examination, Dr. Harris opined that Bradley-Wagner had "significant functional limitations," including an inability to more than occasionally carry ten pounds at the waist level. *Id.* He further opined that Bradley-Wagner could sit for a maximum of forty minute intervals for a maximum of five to six hours per day, and could stand for fifteen minute intervals for a maximum of two to three hours per day. (Tr. 354.) Finally, Dr. Harris recommended that she should avoid any climbing and repetitive stooping, bending, or lifting from the floor level. (Tr. 353.)

---

[4]Dr. Harris noted slightly better range of motion in Bradley-Wagner's cervical spine, while Dr. Sioson noted slightly better range of motion in her dorsolumbar spine. (Tr. 333-334, 347-348.)

State agency physician Paul Morton, M.D., reviewed the medical evidence and, on May 10, 2012, found Bradley-Wagner could perform light work with additional postural limitations, warranted based on the reduced range of motion in her shoulders, cervical spine, dorsolumbar spine, hip flexion and knees.  (Tr. 106-107.)

### State Agency Physicians – Mental Assessments

Turning to Bradley-Wagner's mental limitations, David House, Ph.D., performed a consultative examination on December 9, 2011, at the request of the Social Security Administration.  (Tr. 339-344.)  Dr. House reported that Bradley-Wagner "was derailed most of the time through the examination."  (Tr. 340.)  He further reported that Bradley-Wagner was overtly delusional and hallucinating, and appeared to have very little direct cognitive control over her thought process.  (Tr. 340-342.)  He described her as "floridly psychotic in manner." (Tr. 341.)

During the examination, Bradley-Wagner reported that her father was dead, but he "come[s] to see [her] sometime," and that Tina Turner "came over last night – tried to kill [her] about Ike."  (Tr. 340-341.)  When asked if she was married, Bradley-Wagner responded, "[W]as a blizzard – let me in – wouldn't."  (Tr. 340.)  When asked about her daily activities, she responded, "[D]on't sleep – sit in the garage – got dogs – dog bit – fight me – ambulance – police – took to doctor – way down there."  (Tr. 341.)  She appeared to relate a story of childhood abuse in a similar fragmented fashion.  (Tr. 342.)  Dr. Harris described Bradley-Wagner as "a very poor historian."  (Tr. 339.)

Although Bradley-Wagner was oriented to person, partially for place, and partially for time, she was not able to complete the tasks requested by Dr. House, nor could she focus to

9

perform any serial exercise.  (Tr. 342.)  However, in more lucid moments, when asked about her

disability she complained of back problems.  (Tr. 340.)  She reported suffering from depression,

(Tr. 341), and taking two medications, Flexeril and Fluoxetine, prescribed by Dr. Pandit.  (Tr.

340.)

      Dr. House concluded that Bradley-Wagner was severely limited in her ability to focus

effectively on her external world and that she would be disruptive and dysfunctional in a work

environment.  (Tr. 343.)  Additionally, Dr. House opined that Bradley-Wagner was severely

limited in her ability to maintain attention and concentration and had difficulty with her recent

and remote memory.  *Id.*  Dr. House diagnosed Bradley-Wagner with Schizophrenia, Paranoid

Type.  *Id.*  He assigned a Global Assessment of Functioning ("GAF") score of 21.[5]  (Tr. 344.)

      On May 11, 2012, following Bradley-Wagner's request for reconsideration of the initial

decision denying benefits, a second consultative examination was performed by Michael Faust,

Ph.D.  (Tr. 356-362.)  Dr. Faust reviewed the examination reports of both Dr. Sioson and Dr.

House in preparation for her examination.  (Tr. 356.)

      When Dr. Faust inquired about Bradley-Wagner's disability application, she explained,

"my legs are bad and I fall down."  (Tr. 356.)  She also claimed to have "psych problems."  *Id.*

---

[5]The GAF scale reports a clinician's assessment of an individual's overall level of
functioning.  *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American
PsychiatricAssociation, 4th ed. revised, 2000) ("DSM-IV").  An individual's GAF is rated
between 0-100,with lower numbers indicating more severe mental impairments.  A GAF score
between 21-30 indicates behavior that is considerably influenced by delusions or hallucinations
OR serious impairment in communication or judgement (e.g., sometimes incoherent, acts grossly
inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in
bed all day, no job, home or friends).  DSM-IV at 34.  It bears noting that a recent update of the
DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable
psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Association, 5th ed., 2013).

Dr. Faust described Bradley-Wagner as a reliable historian.  *Id.*  She reported that she last worked three years prior to the examination, and was fired from her job as a cleaner (a position she held for one week) due to her inability to stand.  (Tr. 357.)

During the examination, Bradley-Wagner reported that she was raped as a child, and described her former husband as a "dope head" and "woman beater."  *Id.*  She reported that she had no means of support (she was receiving food stamps) and that she had been homeless for three years, after she was evicted from her government-subsidized housing because her grandson sold drugs from her apartment.  *Id.*  Bradley-Wagner described difficulty with former co-workers, and reported that she "[does not] like to be told what to do."  *Id.*  She also admitted difficulties with attendance and tardiness.  *Id.*  She further admitted a long history of interpersonal violence and fighting with others.  (Tr. 358.)  Bradley-Wagner described her typical mood as "[d]on't want to talk."  *Id.*  She reported crying spells daily, most often when she was confronted about her future.  *Id.*  She reported low interest and motivational levels, although Dr. Faust observed that she projected a normal energy level and did not exhibit signs of depression, anxiety, or psychosis.  (Tr. 358-359.)  Dr. Faust reported no hallucinations or delusions.  (Tr. 359.)

Bradley-Wagner reported taking the following prescription medications: Hydrochlorothiazide, Percocet, Tramadol, and Flexeril.  (Tr. 358.)  She further reported taking Prozac (which she discontinued because it made her sleepy and nauseous) and Paxil (which she discontinued because it made her "run [and] hallucinate.")  *Id.*

Dr. Faust observed that Bradley-Wagner made no eye contact, appeared annoyed, and was easily irritated.  (Tr. 359.)  She performed very poorly on cognitive testing.  *Id.*  However,

11

Dr. Faust acknowledged that Bradley-Wagner refused to put forth any effort during the testing, despite having no difficulty with concentration and understanding.  More specifically, Dr. Faust observed that she had no difficulty understanding questions or instructions, including multi-step or complex instructions.  He further observed that she purposefully gave incorrect answers, which invalidated the test results.[6]  *Id.*

Based upon his examination, Dr. Faust concluded that Bradley-Wagner functioned in the average IQ range and had no deficits in memory functioning.  He further concluded that her performance on the mental status tasks demonstrated that "she is attempting to appear incapacitated when her behavior and understanding of all questions in the interview contradicted test results."  (Tr. 361.)  Dr. Faust further observed that Bradley-Wagner may not have been forthcoming about possible alcohol abuse.  He assigned a GAF score of 70.[7]  *Id.*

Despite Dr. Faust's observation that Bradley-Wagner was attempting to appear incapacitated, he diagnosed a personality disorder with mixed traits.  (Tr. 360.)  In connection with her personality disorder, Dr. Faust opined that Bradley-Wagner would experience difficulty with handling stress, cooperating with others, and maintaining persistence and pace for task completion.  (Tr. 361.)

---

[6]Dr. Faust predicated this conclusion on Bradley-Wagner's alleged inability to answer simple questions, (*i.e.,* What day follows Monday?, How many days are in a week?, What color is the ocean?), or recognize simple objects.  For instance, during the examination, she identified a ball as a triangle.  (Tr. 360.)

[7]A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, with some meaningful interpersonal relationships.

State Agency psychological consultant, Vicki Warren, Ph. D., reviewed Bradley-Wagner's mental health records.  She opined that Bradley-Wagner suffered from mild to moderate impairments in her ability to maintain social functioning, maintain attention and concentration for extended periods, complete a normal workweek or day, interact with the public, or accept instructions or criticism from supervisors.  (Tr. 125.)  Dr. Warren also noted that Bradley-Wagner's ability to respond to work pressures was dependent upon her motivation, and that she may exhibit difficulty responding appropriately with supervisors and coworkers related to her personality disorder and lack of motivation.  *Id.*

### *Hearing Testimony*

During the hearing on May 8, 2013, Bradley-Wagner testified to the following:

- The only medications that she had taken that morning were to treat hypertension and heartburn.  (Tr. 33.)

- She worked sporadically as a cleaner and a part-time housekeeper until December of 2011, when pain in her legs and back prevented her from continuing her duties.  (Tr. 43.)  She began falling at work, and her employer became frustrated with her inability to perform specific tasks.  (Tr. 44.)

- If she is able to walk to the store, she cannot walk back to her home.  As a consequence, she rarely leaves her home, (Tr. 40), except to attend monthly medical appointments.  (Tr. 47.)

- She suffers from constant pain in her back and legs.  Due to the pain, she "can't stand" or "do anything."  Her doctor told her that she was born with a "hole in [her] spine", and he wanted to "put[ ] a block in it."  She guessed that he was "going to have to cut it and put some stuff in it and seal it up."  (Tr. 46-47.)

- She testified that she "[has] voices talking to [her] all the time," and that she "[does not have any] problem talking to them."  She feels like people are talking about her and laughing at her all the time.  As a result, she does not go outside.  She does not want to be "bothered with nobody [sic]."  (Tr. 53.)  Her mother was her only friend, but she passed four months prior to the hearing.  (Tr. 54.)

13

- She was in extreme pain and she needed to speak to a psychologist because it was "getting out of hand."  She stated that she "[c]an't work because who want [sic] to be bothered with me, because the first time I fall down and the first thing they're going to think I'm trying to sue them."  (Tr. 70.)

The VE testified Bradley-Wagner had past relevant work as a cleaner (DOT medium, light as performed, unskilled) and housekeeper (DOT medium, light as performed; semi-skilled). (Tr. 62-63.)  The ALJ then posed the following hypothetical:

> [A]ssume an individual similar to the claimant in age, education, and work history who can engage in light exertion.  That means lifting up to [20] pounds occasionally and up to 10 pounds frequently. . .Never climb ladders, ropes, or scaffolds, may frequently climb ramps and stairs and frequently balance; occasional stooping, kneeling, crouching, and crawling; avoid concentrated exposure to extreme cold and extreme heat. As for mental, no limits in understanding, remembering, and following instructions; can maintain concentration, persistence, and pace over a normal work day and work week for work that is SVP:1 through SVP: 3; can interact with others to accept instruction and to carry out instructions, but should not be required to influence or persuade others to follow instructions.

(Tr. 63-64.)  The VE testified such an individual could return to the job of cleaner as performed, and the job of housekeeper as performed, but neither as identified in the DOT.  (Tr. 64-65.)

The ALJ then posed the following second hypothetical:

> [T]he same physical limitations, but . . . unskilled . . . Can maintain concentration, persistence, and pace over a normal work day and work week for work that is unskilled.

(Tr. 65.)  The VE testified the second hypothetical would eliminate the housekeeping job, but not the cleaner job as performed.  (Tr. 65.)

The ALJ then posed the following third hypothetical:

> [L]ight exertion but limited standing and walking to a maximum of four hours a day and everything else physically remains the same and unskilled work.

14

(Tr. 65.)  The VE testified the third hypothetical would eliminate both jobs.  (Tr. 65.)  He further testified there were other jobs in the regional or national economy that such an individual could perform, including the jobs of electrical accessories assembler (light, unskilled); cashier (light, unskilled); and, inspector, hand packager (light; unskilled).  (Tr. 66-67.)  The VE testified that each of the foregoing jobs included a sit/stand option.  (Tr. 66.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a)[8].

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and, (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

---

[8] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity."  Second, the claimant must suffer from a "severe impairment."  A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled.  For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Bradley-Wagner was insured on her alleged disability onset date, January 1, 2011 and remained insured through the date of the ALJ's decision, June 4, 2013. (Tr. 13.) Therefore, in order to be entitled to POD and DIB, Bradley-Wagner must establish a continuous twelve month period of disability commencing between those dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found that Bradley-Wagner established medically determinable, severe impairments, due to degenerative changes in the form of canal stenosis, facet arthropathy and disc protrusion compressing the exiting L3 nerve root, and depression (Tr. 13); however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 14-15.) Bradley-Wagner was found capable of performing her past work activities, and was further determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 15-19.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Bradley-Wagner was not disabled. (Tr. 18-19.)

### V.  Standard of Review

16

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence

in the record to support the decision, [where] the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.

Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996);

*accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is

not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL

2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9,

2010).

## VI.  Analysis

### *RFC Assessment*

In her first and second assignments of error, Bradley-Wagner contends the RFC is not

supported by substantial evidence because the ALJ failed to properly evaluate the opinion

evidence regarding her physical and mental impairments.  The Commissioner maintains the ALJ

reasonably considered the many state agency physician opinions in this case, arguing the fact

"[t]hat Plaintiff wishes the ALJ would have weighed the opinion evidence differently to find

18

further limitations in Plaintiff's work-related abilities is not a basis for remand[]." (Doc. No. 19 at 11.)

The RFC determination sets out an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.946(c). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D. Mich. Mar. 26, 2012) (citing *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id.* When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant

provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. §
404.1527(e)(2)(ii).

Finally, an ALJ "must explain in the decision the weight given to the opinions of a State
agency medical or psychological consultant or other program physician, psychologist, or other
medical specialist" unless a treating physician's opinion has been accorded controlling weight.
*Id.* However, "[i]n the absence of treating-source status . . . [courts] do not reach the question of
whether the ALJ violated *Wilson v. Comm'r of Soc .Sec.*, 378 F.3d 541 (6th Cir. 2004), by failing
to give reasons for not accepting their reports." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875
(6th Cir. 2007).

### *Physical Impairments*

With respect to her physical impairments, Bradley-Wagner argues she is only capable of
sedentary work, based upon the opinion of consulting examiner, Dr. Harris. She asserts Dr.
Harris was the most qualified examining source and provided the most thorough and timely
assessment of her physical problems. She further asserts Dr. Sioson's opinion is internally
inconsistent, because he stated Bradley-Wagner was capable of performing "light *or* sedentary
work." (Tr. 332) (emphasis added). According to the regulations, a claimant capable of light
work is also capable of sedentary work. Therefore, Bradley-Wagner reasons Dr. Sioson's choice
of the word "or" indicates his misunderstanding of the regulations.

Here, the ALJ recounted Bradley-Wagner's self-reported symptoms, as well as the medical
evidence regarding her physical and mental impairments. (Tr. 16-17.) With regard to Bradley-
Wagner's physical impairments, the ALJ cited medical evidence demonstrating she had
degenerative disc disease of the lumbar spine with disc protrusion compressing the exiting L3

nerve root, and degenerative disc space narrowing with facet arthropathy of the cervical spine confirmed by x-ray and MR imaging. (Tr. 16.) The decision further noted Bradley-Wagner had received treatment for this condition in the form of physical therapy, medication, and caudal blocks. *Id.* However, the ALJ observed Bradley-Wagner maintained 5/5 strength in her lower extremities, with only slightly reduced range of motion; and, normal deep tendon reflexes and sensation with no signs of weakness or numbness. *Id.*

> The ALJ assigned the following RFC to Bradley-Wagner:
>
> [L]ight work…except she can lift up to 20 pounds occasionally and up to 10 pounds frequently; she can never climb ladders, ropes and scaffolds; she may frequently climb ramps and stairs and frequently balance; she can perform occasional stooping, kneeling, crouching and crawling; she must avoid concentrated exposure to extreme cold and extreme heat; no limits in understanding, remembering and following instructions; can maintain concentration, persistence and pace over a normal workday and work week for work that is SVP 1 through SVP 3; she can interact with others to accept instruction and carry out instruction but she should not be required to influence or persuade others to follow instructions.

(Tr. 15.)

In so finding, the ALJ weighed the opinion evidence regarding Bradley-Wagner's physical impairments as follows:

> The undersigned concurs with the opinion of State agency medical consultant Paul Morton, M.D., dated May 10, 2012 (exh. 6A). Dr. Morton opined that the claimant is capable of performing a reduced range of light work (exh. 6A pp. 11-12). Dr. Morton's opinion is wholly consistent with the medical evidence of record, which demonstrates that the claimant generally maintains full strength, sensation, reflexes and range of motion in her extremities, with no signs of weakness or atrophy.
>
> The undersigned accord [sic] great weight to the September 19, 2011 opinion by consultative examiner Dr Sioson, who opined that the claimant could perform light or sedentary work. Dr. Sioson's opinion is based on his objective evaluation of the claimant and supported by the observations of Dr. Stickney. Dr. Sioson observed the claimant to generally have 5/5 strength, but for her left hip and knee flexors, in which she has 4/5 strength (exh. 3F p. 3). The claimant had reduced range of motion in her lumbar spine and cervical spine, but otherwise had normal flexion in

her extremities.  Dr. Sioson observed the claimant had no signs of atrophy.
Although the claimant complained of knee pain, she had no signs of heat, redness,
swelling, sublaxation or gross deformity in the joints.

* * *

The undersigned accords limited weight to the opinion by consulting physician Dr.
Harris at Exhibit 6F which states the claimant can lift/carry up to 10 pounds at the
waist level occasionally, she should avoid repetitive stooping or bending, and
repetitive lifting from the floor level, she can sit for 40 minute intervals for a
maximum of 5-6 hours, stand for a maximum of 15 minute intervals for a maximum
of 2-3 hours per day (exh. 6F pp. 9-10.)  Dr. Harris' opinion that the claimant is
limited in her ability to lift, stand and walk is not supported by his objective
evaluation of the claimant, in which her functioning appeared normal in most
categories.

(Tr. 17-18.)

Finally, the ALJ relied upon "multiple misrepresentations in the record" to conclude that

Bradley-Wagner's allegations of disabling pain and mental and emotional instability were not

entirely credible.  (Tr. 18.)  Specifically, the ALJ cited Bradley-Wagner's contradictory

testimony regarding her level of education and work history, as well as psychological

consultative examiner Dr. Faust's conclusion that Bradley-Wagner appeared to be exaggerating

her problems.[9] *Id.*

It is clear from the decision that the ALJ gave greater weight to the opinions of Dr. Sioson

and Dr. Morton, and less weight to the opinion of Dr. Harris, who is a physical medicine and

rehabilitation and pain management specialist.  Bradley-Wagner argues the ALJ should have

given greater weight to the opinion of Dr. Harris, a specialist, pursuant to the regulations.

Bradley-Wagner further argues Dr. Harris provided a more current and more detailed analysis of

---

[9]Notably, Bradley-Wagner does not challenge the ALJ's credibility analysis.

22

her physical limitations, and, therefore, his analysis deserved greater weight than the analysis of Dr. Sioson.

Although the regulations instruct the Commissioner to consider the specialty or specialities of a consulting physician in assigning weight to his or her opinion, the opinion of a consulting specialist may nonetheless be disfavored for lack of support in the medical record. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009)(holding that an ALJ's finding that a medical opinion conflicts with other evidence in the record is a sufficient reason to discount the opinion); 20 C.F.R. § 404.1527(c)(2) ("If any ... medical opinion(s) is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence ...."); *id.* at § 404.1527(d)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

In this case, both of the state agency file-reviewing physicians (i.e., Dr. Morton and Dr. Lewis) concurred with Dr. Sioson's opinion that Bradley-Wagner is capable of light work with additional postural limitations.  Moreover, the strength and range of motion tests performed by both Dr. Sioson and Dr. Harris yielded virtually identical results, revealing full strength and only partially limited range of motion in the spine.  Although there were slight deviations in the respective test results, Dr. Harris actually concluded Bradley-Wagner had greater mobility in her cervical spine.  The ALJ's decision to give greater weight to the opinions of Dr. Sioson and Dr. Morton, rather than the opinion of Dr. Harris, represents a decision within the "zone of choice," wherein the Commissioner can act, without the fear of court interference.  *See Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).  The Court therefore finds

that the ALJ's decision as it relates to Bradley-Wagner's physical RFC is supported by substantial evidence.

Accordingly, Bradley-Wagner's first assignment of error is without merit.

***Mental RFC Assessment***

With respect to her mental impairments, Bradley-Wagner argues the RFC does not accurately reflect the severity of her mental and emotional problems as articulated by the only two consulting examining sources of record, Drs. House and Faust. The Commissioner argues the ALJ properly accorded no weight to the opinions of these examiners in light of Bradley-Wagner's "multiple misrepresentations" and Dr. Faust's conclusion that she was exaggerating her symptoms.

In the decision, the ALJ discussed the medical evidence regarding Bradley-Wagner's mental impairment as follows:

> The claimant complains of depression throughout the record, however, she does not seek specific mental health treatment. The evaluation reports of consultative psychologists David V. House and Michael Faust, Ph.D., confirm the claimant has a mental impairment, however, Dr. Faust diagnosed the claimant as having alcohol abuse and a personality disorder, and Dr. House diagnosed the claimant as having schizophrenia, paranoid type (exhs. 5F, 7F). Dr. Faust noted that the claimant attempted to appear incapacitated, however, her thoughts appeared intact and calculated (exh. 7F, p. 6). The claimant also intentionally misstated her part-time work as cleaner. She told Dr. Faust that she last worked three years prior to the interview, and she told Dr. House that she worked a year prior to the interview (exhs. 5F p. 4, 7F, p.3). The claimant testified at the hearing that she worked on a part-time, weekly basis from January 1, 2011, through approximately December 25, 2011.

(Tr. 17.)

The ALJ then weighed the opinion evidence regarding Bradley-Wagner's mental impairments:

24

The undersigned accords some weight to the State agency consultative psychologist's opinion that the claimant can complete tasks that do not involve extended periods of attention, concentration, or more than daily planning  (exh. 6A p. 12).  While the undersigned ultimately concurs that the claimant does not retain the residual functional capacity to perform skilled work, the undersigned finds that Dr. Warren's rational [sic] regarding the claimant's ability to adapt to handle changes was not consistent.  Generally, Dr. Warren stated that the claimant had adaptation limitations, however, Dr. Warren later indicated that the claimant is not significantly limited, or there is no evidence of limitation.

* * *

The undersigned accords no weight to the opinions of Dr. House and Dr. Faust at Exhibits 5F and 7F.  The undersigned concurs with Dr. House's opinion that the claimant intentionally overstated her signs and symptoms.  Furthermore the record confirms that she intentionally misled both psychologists about her daily activities and work activities.

(Tr. 17.)[10]  As noted above, the RFC assigns the following mental limitations: " . . .  no limits in understanding, remembering and following instructions; can maintain concentration, persistence and pace over a normal workday and work week for work that is SVP 1 through SVP 3; she can interact with others to accept instruction and carry out instruction but she should not be required to influence or persuade others to follow instructions."  (Tr. 15.)

The Court finds the ALJ properly evaluated the opinion evidence regarding Bradley-Wagner's mental limitations.  As set forth above, the ALJ gave no weight to the opinions of Drs. House and Faust, and credited only one part of Dr. Warren's opinion, that Bradley-Wagner can only complete tasks that do not involve extended periods of attention, concentration, or more than daily planning. The ALJ's rejection of the opinions of the consulting physicians was predicated upon (1) the ALJ's agreement with Dr. Faust that Bradley-Wagner "intentionally

---

[10]  As the ALJ noted earlier in the decision, it was, in fact, Dr. Faust (not Dr. House) that opined that Bradley-Wagner "purposefully gave incorrect answers," which invalidated test results, and that she was "attempting to appear incapacitated."  (Tr. 359, 361.)

overstated her signs and symptoms;" and, (2) evidence "confirm[ing] that [Bradley-Wagner] intentionally misled both psychologists about her daily activities and work activities."  (Tr. 17.)

Supporting this conclusion, the ALJ notes elsewhere in the decision that Bradley-Wagner's "presentations to Drs. House and Faust were unlike any other presentation and, hence, it reduces her credibility significantly."  (Tr. 18.)  Specifically, the ALJ notes that "[i]n other physical examinations, and in presentation to physicians at St. Vincent, the claimant presented in a normal fashion" and "there are no other indications of hallucinations, or delusions."  *Id.* Substantial evidence supports the ALJ's conclusion in this regard.  For instance, three months prior to her consultative examination with Dr. House, Dr. Sioson described Bradley-Wagner as "alert, coherent, [and] oriented," as well as "cooperative and with no abnormal behavior or appearance."  (Tr. 231.)  Bradley-Wagner told Dr. Sioson that she had been diagnosed with depression roughly a year earlier and was prescribed Prozac, but that she had stopped taking it because it made her sleepy.  (Tr. 330.)

Moreover, five months after her consultative examination with Dr. House, Dr. Harris described Bradley-Wagner as a pleasant, healthy individual, in no apparent distress.  (Tr. 352.) She was alert and oriented during her physical examination.  (Tr. 353.)  In fact, the medical record reflects many appointments and emergency room visits where Bradley-Wagner appears well and is cooperative.  (Tr. 468, 475, 480, 491, 502, 512.)  Dr. Warren opined that Bradley-Wagner's behavior during the first consultative mental examination was "highly inconsistent from both the [field office] and the [physical consultative exam]" and she concluded that "there is no other evidence to support a mental impairment."  (Tr. 109.)

Additionally, substantial evidence supports the ALJ's conclusion that Bradley-Wagner "misled both psychologists" about her work activities.  As the ALJ notes, Bradley-Wagner told Dr. Faust that she last worked three years prior to the examination.  (Tr. 357.)  The only information Bradley-Wagner gave Dr. House about her employment history was that somebody "gave [her] $60 last year to clean."  (Tr. 341.)  As Dr. House's examination of Bradley-Wagner occurred in December 2011, Bradley-Wagner appeared to be reporting that she last worked in 2010.  However, during the hearing, Bradley-Wagner testified she worked on a part-time, weekly basis from January 1, 2011 through December 25, 2011.  (Tr. 43.)

The Sixth Circuit has observed that an ALJ does not err in assigning little weight to a physician's opinion that is based on a claimant's self reports, which are themselves not credible. *See Vorholt v. Comm'r of Soc. Sec.*, 409 F. App'x 883, 889 (6th Cir. 2011)(the claimant lied about marijuana use); *see also Webb v. Comm'r of Soc. Sec.*, 2014 WL 129237, at *6 (E.D. Tenn. Jan. 14, 2014)(the claimant lied about the number of seizures she suffered).  Here, Dr. Faust himself questioned Bradley-Wagner's credibility, concluding that she "purposefully gave incorrect answers" on mental status tasks and "attempted to appear incapacitated."  (Tr. 359, 360, 361.)  The ALJ concurred with this assessment and on that basis (along with the fact that Bradley-Wagner misrepresented her work history) reasonably rejected the functional limitations proposed by either Drs. House and Faust to the extent they were greater than that set forth in the RFC.[11]

---

[11] These circumstances render the instant case distinguishable from *Keeton v. Commissioner of Social Security,* 583 Fed. Appx. 515 (6th Cir. 2014).  In *Keeton*, the Sixth Circuit was confronted with an ALJ's rejection of an examining psychologist's opinion because it was based upon "an unquestioning acceptance of claimant's subjective complaints" and  "the doctor's opinion is unsupported by other evidence, especially treatment records from the

Bradley-Wagner nevertheless argues the ALJ should have given at least some weight to Dr. Faust's opinion that she would experience difficulty with handling stress, cooperating with others, and maintaining persistence and pace for task completion. (Tr. 361.) However, Dr. Faust did not indicate the degree of difficulty Bradley-Wagner would experience in the foregoing areas. Indeed, Dr. Faust assigned a GAF score of 70, which indicates only mild symptoms. (Tr. 361.) As a consequence, even if the ALJ had assessed great weight to Dr. Faust's opinion, Bradley-Wagner's mild limitations would not have altered the RFC.

The ALJ credited in part the opinion of Dr. Warren, who reviewed the opinions of both consulting physicians, as well as the other medical evidence in the record, and concluded that Bradley-Wagner was moderately limited in her ability to accept instruction and respond appropriately to criticism from supervisors; to perform at a consistent pace without interruption; and, to maintain attention and concentration for extended periods of time. (Tr. 108-109.) Dr. Warren concluded Bradley-Wagner was not significantly limited in any other functional category. The Court finds that the ALJ's decision as it relates to Bradley-Wagner's mental RFC is supported by substantial evidence.

Accordingly, Bradley-Wagner's second assignment of error is without merit.

---

claimant's therapist." *Id*. at 525. The Sixth Circuit found the ALJ's rejection of the opinion was not supported by substantial evidence for a number of reasons, including that the psychologist's opinion was not, in fact, based solely on the claimant's self-reporting but also was based on his own observations of the claimant's physical symptoms and behavior. *Id*. at 526. Significantly, the court also noted that "there is no indication in the record that Plaintiff's reports to [the psychologist] were inaccurate or embellished for purposes of procuring disability benefits." *Id*. at 527. Here, by contrast, Dr. Faust himself concluded that Bradley-Wagner was exaggerating her symptoms and attempting to appear incapacitated. Moreover, unlike in *Keeton*, the ALJ also rejected these opinions because of Bradley-Wagner's mispresentations regarding her work history.

**VII.  Decision**

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the decision is AFFIRMED.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: November 12, 2015